RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0165p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CHARLES M. HOLLIS, JR.; MELANIE HOLLIS, Individually and as Next Friends for H.H. and C.A.H, two minor children,

　　　　　　*Plaintiffs-Appellants,*

　　　*v.*

CHESTNUT BEND HOMEOWNERS ASSOCIATION,

　　　　　　*Defendant-Appellee.*

No. 13-6434

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cv-00137—Aleta Arthur Trauger, District Judge.

Argued: June 19, 2014

Decided and Filed: July 29, 2014

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Stephen M. Dane, RELMAN, DANE & COLFAX PLLC, Washington, D.C., for Appellants. Gary R. Wilkinson, LAW OFFICE OF GARY R. WILKINSON, Nashville, Tennessee, for Appellee. **ON BRIEF:** Stephen M. Dane, Ryan C. Downer, RELMAN, DANE & COLFAX PLLC, Washington, D.C., Larry L. Crain, CRAIN, SCHUETTE & ASSOCIATES, Brentwood, Tennessee for Appellants. Gary R. Wilkinson, LAW OFFICE OF GARY R. WILKINSON, Nashville, Tennessee, for Appellee.

1

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.  In this appeal we are asked to determine the proper summary-judgment framework for evaluating a reasonable-modification claim brought under the Fair Housing Act (FHA).  Melanie and Charles Hollis filed a complaint against the Chestnut Bend Homeowners Association (CBHA), which governed their residential neighborhood and enforced the neighborhood's restrictive covenants.  The complaint charged the CBHA with unlawfully refusing to permit the Hollises to construct a sunroom addition to their home.  The sunroom allegedly would have alleviated some of the problems experienced by the Hollises' two minor children, H.H. and C.A.H., each of whom has been diagnosed with Down Syndrome.  The Hollises brought the suit both individually and as "next friends" of the children.  The district court dismissed their personal-capacity claims for want of standing and then, applying the *McDonnell Douglas* burden-shifting test to the reasonable-modification claim, awarded summary judgment to the CBHA on the "next friend" claim.  We vacate and remand.

## I.

The events at the heart of this suit transpired in late 2011 and early 2012, when Charles and Melanie Hollis lived with their five children in a house they owned in Franklin, Tennessee.  Their two youngest children, H.H. and C.A.H., both had Down Syndrome and suffered from developmental disabilities.  H.H. was prone to spontaneous outbursts and self-injurious attacks, and C.A.H. experienced severe hearing and vision impairment.  No one disputes that H.H. and C.A.H. were disabled within the meaning of the FHA.  This action instead turns on whether the CBHA unlawfully refused to permit the Hollises to attach a sunroom to their house in order to permit H.H. and C.A.H. to enjoy the therapeutic benefits of sunlight.

### A.

The Hollises' home was situated in a residential subdivision known as Chestnut Bend, which encompasses about 168 houses.  The CBHA, a not-for-profit corporation, was responsible for managing the neighborhood.  The CBHA was governed by a five-member board, which

retained Westwood Property Management to manage the CBHA's day-to-day affairs. Westwood employed Mary Jean Turner to act as its property manager, and in that capacity Turner regularly met and corresponded with the board.

Properties located within Chestnut Bend were subject to various covenants, conditions, and restrictions. One such covenant barred homeowners within Chestnut Bend from erecting above-ground structures or improvements until the homeowner acquired approval from the CBHA's Architectural Review Committee (ARC). Three members comprised the ARC, all of whom the board appointed but none of whom were members of the board. One board member acted as a liaison between the ARC and the board, and Turner acted as a liaison between the ARC and the homeowners.

Homeowners submitted architectural improvement applications to Turner using a form application captioned "APPLICATION FOR FENCE/STRUCTURE/EXTERIOR CHANGE — 080810" (Form 080810). Form 080810 provided that homeowners seeking ARC approval must submit the proposed structure's specifications together with a plot plan showing the homeowner's property lines and building setbacks, a sample board of materials to be used, and color samples of paints and stains. Turner reviewed homeowners' proposals to ensure their completeness. The application was not considered complete if it did not include all of the information requested on Form 080810.

Turner was then responsible for putting the application into the hands of the ARC members and the board's ARC liaison. The ARC would review the proposal and convey its decision to Turner. Chestnut Bend's Declaration of Covenants, Conditions, and Restrictions stipulated that any architectural plan submitted to the ARC "shall be deemed approved if not acted upon by the [ARC or the board] within thirty (30) days of submission." If the ARC decided not to approve a project, it often provided no reason for its decision; Turner simply sent a boilerplate letter informing the applicants of the ARC's decision. A homeowner who was displeased with the ARC's decision could request review of his or her application by the board.

**B.**

At some point in time the pediatric cardiologist treating H.H. and C.A.H. advised the Hollises that the children "would benefit from a particularized living environment that is therapeutically designed to stimulate their development." The Hollises therefore decided to construct a sunroom addition to their house. They chose their preferred design for the sunroom and submitted four separate proposals to the ARC. Although this appeal relates only to the fourth proposal, the Hollises initially challenged the CBHA's treatment of each application, and the district court analyzed all four. We therefore provide a brief review of each application.

In March 2011 Mrs. Hollis sent an email to an ARC member declaring the Hollises' intention to add a sunroom to their house. The next day Mrs. Hollis provided that ARC member with Form 080810, which listed the proposed sunroom's measurements and included a photograph of the proposed design. But the application did not provide the detailed specifications required by the ARC, and it included no information about the exterior elevations, property lines and setbacks, or materials. The following month Turner sent a letter to the Hollises stating that their application was incomplete and asking them to resubmit their application with the missing information. The Hollises' contractor subsequently delivered the requested specifications to Turner, but the board nevertheless rejected the Hollises' application because they disapproved of the aesthetics of the proposed construction materials.

The Hollises submitted a second application in August 2011. They proposed a new design for the sunroom that would better match their house and the other residences in the community. The exterior would be covered in the same style of siding used on the Hollises' house, and they opted for a shingled roof rather than metal. But the ARC vetoed this proposal as well and asked the Hollises to use a brick or stone exterior rather than siding. Turner also asked them to submit an exterior plot plan and a professional drawing of the proposed sunroom.

Rather than submitting the requested information, the Hollises sent an email in September 2011 proposing to construct an exact replica of the sunroom owned by Chestnut Bend homeowner and former ARC member Clay Morgan. Like the two prior proposals, this application omitted many of the details required by Form 080810, and the board immediately denied the application for that reason. In a lengthy, exasperated, and heartfelt email response to

that denial, Mrs. Hollis explained that the sunroom's "sole purpose" was to give H.H. and C.A.H. "needed safe play space with as many windows and screens as possible to allow them to enjoy the 'feel' of being outdoors." Mrs. Hollis explained her willingness to "battle[] for an 'outdoor' play space" because H.H. "wants to be outside more than anything else in the world." This marked the first time Mrs. Hollis informed the ARC that the purpose of the sunroom was to provide therapeutic benefits to her disabled children.

Three weeks later Turner responded by letter and again asked the Hollises to submit a complete application packet, including a plot plan, professional drawings of the sunroom, and samples of the materials to be used. Mrs. Hollis responded in an email whose tone betrayed her vexation. Although she declined the board's invitation to attend one of its meetings, she berated the ARC and board members who were responsible for the denial of her applications. Mrs. Hollis attached to her email copies of her previous correspondence with the ARC and board members, and she also attached photographs of the proposed sunroom, apparently in lieu of the requested drawings and samples. Mrs. Hollis also pasted the text of the FHA's "reasonable accommodations" provision and stated that she would "involve an attorney" if her application were again denied. Evidently no one responded to Mrs. Hollis's email.

Sometime around October 2011 both the Hollises and the CBHA retained counsel, and the involvement of dispassionate personalities led to a denouement of sorts. After a spurt of communications between the two sides, Bob Notestine, counsel for the CBHA, sought to reset the application process and asked the Hollises' attorney to submit a complete application "clearly showing what [the Hollises] want to build and meeting the application criteria." On December 6, 2011, the Hollises' attorney, Tracey McCartney, submitted a complete application to Turner. In an email conversation the next day, members of the ARC agreed to approve the application "with one change": The ARC wanted the Hollises to use a shingled roof rather than the metal roof proposed in their application. But the ARC members agreed that the ultimate decision to approve the Hollises' application should be made by the board. Turner forwarded the ARC members' email conversation to the board.

The board discussed the Hollises' application at its December 13 meeting. The minutes of that meeting reveal that the board planned to prepare an "approval letter" that included a

"request for consideration of a shingled roof." Notestine sent a board-approved letter to McCartney two days later. The letter stated that "the ARC prefers not to approve a metal roof" because "there is some feeling that approval of metal roofs could create a new standard or at least would cause confusion about the shingle roof preference." The letter concluded by asking whether the Hollises "would agree to the above . . . request[] by the ARC. If so, I would suspect that approval will be forthcoming."

McCartney responded that same day. "The Hollises will consider the shingled roof option," she wrote, "but cost will be a consideration." McCartney reminded Notestine that the ARC had previously identified metal as an acceptable roof material in its communications with Mrs. Hollis, and in McCartney's view "the ARC appears to have moved the goalposts again." McCartney promised to "get back to [Notestine] on the roof ASAP" but also "encourage[d] the ARC to honor" its previous commitment to permit the Hollises to use a metal roof. Notestine forwarded the letter to Turner, who in turn forwarded it to the board members.

McCartney sent another letter to Notestine the following day—December 16. "The Hollises wish to move forward with a metal roof," the letter stated, because "[a] metal roof has a number of advantages for the Hollises, including cost and relative ease of installation." The letter also stated that the Hollises "prefer metal for the sensory stimulation it can provide, which is important for the development of their two children with Down Syndrome." McCartney said the Hollises would proceed "with available legal options" if the ARC did not "consent[] to the design as submitted, metal roof included," within six days.

Notestine did not respond to McCartney's letter until one month later. On January 16, 2012, he sent an email to McCartney apologizing that the past month had been "particularly hectic." "You stated in your letter that your clients would proceed 'with available legal options.' What options have your clients decided to pursue?" Notestine then asked McCartney to advise him "how your clients want to proceed in this matter." Notestine copied Turner on the email.

## C.

Sometime in early 2011, shortly after the ARC opposed the Hollises' initial effort to construct a sunroom, the Hollises began to look for a new house in a different neighborhood. In

December 2011 they found a suitable house, but Mrs. Hollis was very reluctant to leave the house in Chestnut Bend.  Ultimately Mr. Hollis concluded that the sunroom fiasco was too discomfiting, and he convinced Mrs. Hollis to move the family to the new house.  The Hollises moved into their new house in March 2012 and sold their Chestnut Bend home that same month.

Mr. and Mrs. Hollis filed this action against the CBHA and Westwood on February 2, 2012, both individually and as next friends of their children, H.H. and C.A.H.  The complaint lists just one count: a violation of the FHA, 42 U.S.C. § 3604.  The Hollises seek $300,000 in compensatory damages related to the sale of their house.  In August 2013 the Hollises agreed to dismiss Westwood from this litigation, and in return Westwood agreed to educate its employees about the "requirements, spirit and purpose of the Fair Housing Act" and to retain attorneys to advise them "when fair housing issues arise."

In September 2013 the district court disposed of the remaining claim against the CBHA. The court first held that the Hollises lacked standing to bring a personal-capacity FHA claim. Mr. and Mrs. Hollis "fail[ed] to distinguish their individual claims from their children's claims in both the Complaint and their briefs," the district court stated, and "fail[ed] to demonstrate any individual standing that [they] may have in this matter as parents of H.H. and C.A.H." *Hollis v. Chestnut Bend Homeowners Ass'n*, 974 F. Supp. 2d 1096, 1097 (M.D. Tenn. 2013).  After dismissing the Hollises' personal-capacity claim, the district court then awarded summary judgment to the CBHA on the Hollises' next-friend claim.  To analyze their FHA reasonable-modification claim, the court applied the "three-part evidentiary standard set forth by the Supreme Court for employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* at 1109.  The district court concluded that the Hollises and the CBHA satisfied their burdens at steps one and two, respectively, of the *McDonnell Douglas* test, but the court awarded summary judgment to the CBHA after determining that the Hollises "failed to produce anything—not even a scintilla of evidence—to suggest that the CBHA's aesthetic reasons for rejecting the [sunroom proposal] were pretextual or unworthy of belief." *Id.* at 1113.

The Hollises filed a Rule 59 motion to alter or amend the judgment, arguing that the district court had improperly applied the *McDonnell Douglas* test and had wrongly dismissed their personal-capacity claims.  The district court rejected both contentions.  The court first noted

that "neither the plaintiffs nor the defendant addressed the issue of the appropriate analysis to be applied to the plaintiffs' claims in their summary judgment briefs." *Hollis v. Chestnut Bend Homeowners Ass'n*, No. 3:12-cv-0137, 2013 WL 5774919, at *2 (M.D. Tenn. Oct. 25, 2013). The district court then cited *Choices in Community Living, Inc. v. Petkus*, 517 F. App'x 501 (6th Cir. 2013), to establish that the *McDonnell Douglas* test should be used to analyze all FHA claims that do not involve direct evidence of discrimination.  Shifting to the issue of standing, the district court held that the issue was moot and further faulted the Hollises for "cit[ing] to no binding authority that stands for the proposition that [Mr. and Mrs. Hollis] are entitled to recover under the FHA as individuals in addition to their recovery as next friends of their disabled children." *Hollis*, 2013 WL 5774919, at *4.  The Hollises appealed.

## II.

Because there is no dispute that Mr. and Mrs. Hollis have standing to assert the FHA claim as next friends of their children, we begin by analyzing the merits of the FHA claim and then address their personal-capacity standing.

## A.

The Fair Housing Act, broadly speaking, prohibits discrimination in the sale or rental of housing and in the provision of housing services or facilities "because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(a), (b).  In many ways the FHA, which comprised one piece of the Civil Rights Act of 1968, both tracks and builds upon Title VII of the Civil Rights Act of 1964, which prohibits discriminatory employment practices.  *See* 42 U.S.C. § 2000e-2.  Both Title VII and the FHA prohibit intentional discrimination, known as disparate treatment, as well as "practices that are not intended to discriminate but in fact have a disproportionately adverse effect" on a protected class, known as disparate-impact claims.  *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); *see also Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 381 (6th Cir. 2007) (Moore, J., concurring) ("[A] plaintiff may establish a violation under the FHA by showing that the defendant has an intent to discriminate ('disparate treatment') or that an otherwise neutral practice has a disparate impact on a protected class ('disparate impact')."); *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996).  Because Title VII and the FHA employ

similar language and "are part of a coordinated scheme of federal civil rights laws enacted to end discrimination," *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988), much of our FHA jurisprudence is drawn from cases interpreting Title VII. *See Graoch Assocs.*, 508 F.3d at 371.

The parallels between Title VII and the FHA are not exact, and perhaps the most substantial differences relate to the protection of disabled persons—a class that was excluded from both Title VII and the original FHA. Congress enacted the Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, 102 Stat. 1619, to extend the FHA's protections to disabled persons.[1] 42 U.S.C. § 3604(f)(2). In addition to bringing disabled persons within the FHA's ambit, those amendments added two provisions that expand the definition of unlawful discrimination. Section 3604(f)(3)(A) defines discrimination to include a refusal to permit a handicapped person to make reasonable modifications to existing premises if those modifications may be necessary to afford that person full enjoyment of the premises. Section 3604(f)(3)(B) likewise defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." A disabled individual alleging unlawful housing discrimination thus can rely on any of several different theories to establish an FHA violation: disparate treatment, disparate impact, failure to make a reasonable accommodation, or failure to permit a reasonable modification.[2]

The Hollises' complaint invoked all but the first of these theories: They alleged that the CBHA (1) enforced its regulations, rules, and policies "in a manner that ha[d] a disparate impact on the Plaintiffs," (2) "[f]ail[ed] to allow the Plaintiffs to make a reasonable modification to their home to afford them an equal opportunity to use and enjoy the Property," and (3) "[f]ail[ed] to make reasonable accommodations to afford the Plaintiffs an equal opportunity to use and enjoy the Property." But the Hollises abandoned their disparate-impact claim at the summary-judgment stage, and although they preserved their reasonable-accommodation claim for review

---

[1]The FHA uses the term "handicap" rather than "disability," but the two terms have interchangeable meaning in this context. *See Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1146 n.2 (9th Cir. 2003).

[2]The FHA also requires homebuilders to make certain residential buildings accessible to disabled persons. *See* 42 U.S.C. § 3604(f)(3)(C). That requirement is not implicated here.

in this court, they have urged both the district court and this court to treat their complaint as a reasonable-modification claim.

### 1. Application of the *McDonnell Douglas* Test

The district court acknowledged that the Hollises were proceeding on a reasonable-modification theory. *Hollis*, 974 F. Supp. 2d at 1109–10. But the court evidently thought that the Hollises' choice of theory was immaterial to its analysis; in its view, all FHA claims "are to be analyzed using the three-part evidentiary standard set forth by the Supreme Court for employment discrimination cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* (citing *Lindsay v. Yates*, 578 F.3d 407, 414–15 (6th Cir. 2009); *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000)). "On summary judgment, this burden-shifting scheme first requires that the plaintiff present evidence from which a reasonable jury could conclude that there exists a *prima facie* case of housing discrimination." *Lindsay*, 578 F.3d at 414–15. A successful *prima facie* showing causes the burden of production to "shift[] to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the adverse housing decision." *Id.* at 415 (internal quotation marks omitted). The burden of production then "shifts back to the plaintiff to identify evidence from which a reasonable jury could conclude that the proffered reason is actually pretext for unlawful discrimination." *Id.* (internal quotation marks omitted). At all times the burden of persuasion rests with the plaintiff. *Id.* at 421 (citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002)).

At the outset, we emphasize that what we refer to as the *McDonnell Douglas* test is the intent-divining test described above. Unfortunately, both courts and litigants often confusingly refer to any burden-shifting framework as a *McDonnell Douglas* framework (or a modified *McDonnell Douglas* framework), even when the elements of the burden-shifting framework have nothing to do with intent and pretext. But here we use the term "*McDonnell Douglas* test" as describing the test that is the same test applied by the district court.

The district court was satisfied that the Hollises and the CBHA met their respective burdens at steps one and two of *McDonnell Douglas*. *Hollis*, 974 F. Supp. 2d at 1111–13. But the court awarded summary judgment to the CBHA at step three because "the Hollis Family has failed to produce anything—not even a scintilla of evidence—to suggest that the CBHA's

aesthetic reasons for rejecting [the Hollises' final sunroom application] were pretextual or unworthy of belief." *Id.* at 1113. After faulting the Hollises for "fail[ing] to address the issue of pretext" in their briefs, the district court held that the CBHA's motives were above reproach. *Id.* Although the CBHA's approval process was "persnickety" and "the ARC was fastidious as to its design preferences for the neighborhood," the district court said, there was no evidence that either the CBHA or the ARC acted with ill will or malevolent intent when they refused to approve the Hollises' final application. *Id.* at 1113 & n.19.

This focus on "ill will" logically followed from the district court's reliance on the *McDonnell Douglas* test, but it also highlights why the district court was wrong to presume that the *McDonnell Douglas* test applies to all FHA claims, irrespective of the theory of liability that the plaintiff invokes. In assessing and resolving an FHA claim, the appropriate analytical framework depends on the theory of liability under which the plaintiff proceeds. Because a disparate-treatment claim requires the plaintiff to establish discriminatory animus, analysis of such a claim focuses on the defendant's intent. *See HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 612 (6th Cir. 2012) ("To prevail on a disparate treatment claim, a plaintiff must show proof of intentional discrimination."). This court therefore applies the three-step *McDonnell Douglas* test, which shifts the burden of production from the plaintiff to the defendant and then back to the plaintiff in an effort to zero in on the specific intent underlying the defendant's conduct. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

A disparate-impact claim, by contrast, turns not on the defendant's intent but instead on the broader effects of the disputed housing practice. *See Graoch Assocs.*, 508 F.3d at 371 ("[T]o show disparate impact, a plaintiff must demonstrate that a facially neutral policy or practice has the effect of discriminating against a protected class of which the plaintiff is a member."). The *McDonnell Douglas* test, designed to discern intent, therefore is inapplicable. This court instead uses a different framework that requires the defendant to establish a sufficient business interest in the disputed practice. *Compare id.* at 374 (opinion of Boggs, J.) (proposing a framework that balances the magnitude of the discriminatory effect of the defendant's housing policy against the strength of the business interests underpinning the challenged policy or practice), *with id.* at 382 (Moore, J., concurring) (proposing a modified framework that would require the plaintiff to

establish a *prima facie* case of disparate impact and would then shift the burden to the defendant to prove "that the challenged practice constituted a business necessity and that there existed no less discriminatory alternatives that could serve the business interest").[3]

Nor is the *McDonnell Douglas* intent-divining test applicable to FHA reasonable-accommodation claims, which do not require proof of discriminatory intent. *See Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) ("Reasonable accommodation claims are not evaluated under the *McDonnell Douglas* burden-shifting analysis. . . . This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive."). Section 3604(f)(3)(B) defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." This court's reasonable-accommodation cases therefore focus on the "operative elements" of that provision: whether the proposed accommodation is reasonable and whether it is necessary to afford disabled persons an equal opportunity for enjoyment. *Smith & Lee Assocs.*, 102 F.3d at 794; *see also Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002). Other circuits likewise focus on the reasonableness and necessity of the proposed accommodation. *See Astralis Condo. Ass'n v. Sec'y of U.S. Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 67 (1st Cir. 2010); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218–19 (11th Cir. 2008); *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir. 2006); *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1147–49 (9th Cir. 2003); *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 603–04 (4th Cir. 1997); *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1103–06 (3d Cir. 1996). In fact, the CBHA points to no circuit that uses the *McDonnell Douglas* intent-divining test to assess an FHA reasonable-accommodation claim.[4]

---

[3]*Graoch Associates* produced separate opinions by each of the three judges on that panel, and none of those opinions garnered the support of two judges. Judges Boggs and Moore each proposed competing versions of a burden-shifting framework to be used in FHA disparate-impact cases, and in his short opinion concurring in the judgment Judge Merritt simply concluded that the plaintiff could not establish a *prima facie* case. We do not purport to resolve the questions left open by *Graoch Associates*; it is sufficient to note that none of the separate opinions in that case used the *McDonnell Douglas* intent-divining test to assess the validity of the plaintiff's disparate-impact claim.

[4]The CBHA instead relies on *Lindsay v. Yates*, 578 F.3d 407 (6th Cir. 2009), which, according to the CBHA, "stated that federal housing discrimination claims are analyzed under the three-part standard set forth in *McDonnell Douglas*." But *Lindsay* said no such thing; rather, the *Lindsay* court said that its analysis of the FHA

The *McDonnell Douglas* test is similarly ill-suited for analysis of an FHA reasonable-modification claim. No court of appeals has delineated the appropriate analytical framework for a reasonable-modification claim, but the absence of directly applicable precedent should not be mistaken for a lack of guidance. Both precedent and logic make clear that the *McDonnell Douglas* test is applicable only where the defendant's discriminatory intent constitutes an element of liability, *see, e.g.*, *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997), and an FHA plaintiff need not prove discriminatory intent to establish a viable reasonable-modification claim. Rather, § 3604(f)(3)(A), the FHA's reasonable-modification provision, uses the same "operative elements" as the reasonable-accommodation provision: Both provisions define unlawful discrimination to include the refusal to approve reasonable requests that may be necessary to permit equal and full enjoyment of the property.

### 2. The Appropriate Legal Standard

Having rejected the *McDonnell Douglas* test, we turn to a determination of the proper legal standard. An FHA reasonable-modification plaintiff, like an FHA reasonable-accommodation plaintiff, must prove both the reasonableness and necessity of the requested modification. And although we sometimes refer to those as the "operative elements," other equally important elements also comprise the claim. In addition to proving reasonableness and necessity, an FHA reasonable-accommodation or reasonable-modification plaintiff also must prove that she suffers from a disability, that she requested an accommodation or modification, that the defendant housing provider refused to make the accommodation or to permit the modification, and that the defendant knew or should have known of the disability at the time of the refusal. *See Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621 (6th Cir. 2011)

---

claims *in that case* turned on the three-legged *McDonnell Douglas* test. *Id.* at 414. And that is because the *Lindsay* plaintiffs alleged intentional race discrimination—*i.e.*, the one type of FHA claim for which the *McDonnell Douglas* test is appropriate. *See id.* at 416, 418. *Lindsay* therefore says nothing about whether the *McDonnell Douglas* test should be used in FHA reasonable-accommodations cases, and the CBHA is wrong to rely on *Lindsay* for that proposition.

The CBHA also cites *Choices in Community Living, Inc. v. Petkus*, 517 F. App'x 501 (6th Cir. 2013), to establish that the *McDonnell Douglas* test should be used to analyze all FHA claims. That case indeed stated, in passing and without elaboration, that "[w]e analyze FHA discrimination claims using the *McDonnell Douglas* burden-shifting paradigm." *Id.* at 505. But that case, like *Lindsay*, involved a claim of intentional discrimination, and accordingly it has no bearing on the appropriate analytical framework to be used in this reasonable-modification case.

(citing *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2005)).  The burden is on the plaintiff to establish each element.  *See Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044–45 (6th Cir. 2001); *see also Smith & Lee Assocs.*, 102 F.3d at 796 n.11.

Occasionally we have described a reasonable-accommodation claim as having a third operative element: whether the requested accommodation would afford the disabled resident an equal opportunity to enjoy the property.[5]  *See Smith & Lee Assocs.*, 102 F.3d at 794–95.  But that third element is subsumed within the necessity inquiry.  "Equal opportunity" means that disabled individuals are entitled to live in the same residences and communities as non-disabled individuals, insofar as that can be accomplished through a reasonable accommodation or modification.  *Id.* at 795.  The statute then "links the term 'necessary' to the goal of equal opportunity."  *Id.*  Thus, an FHA reasonable-accommodation or reasonable-modification plaintiff must show that, but for the requested accommodation or modification, he "likely will be denied an equal opportunity to enjoy the housing of [his] choice."  *Id.* (citing *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)).  The necessity element is, in other words, a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive.  *See Wis. Cmty. Servs., Inc.*, 465 F.3d at 749.

But the crux of a reasonable-accommodation or reasonable-modification claim typically will be the question of reasonableness.  To determine the reasonableness of the requested modification, the burden that the requested modification would impose on the defendant (and perhaps on persons or interests whom the defendant represents) must be weighed against the benefits that would accrue to the plaintiff.  *See Groner*, 250 F.3d at 1044.  This is a "highly fact-specific inquiry."  *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002).  A modification should be deemed reasonable if it "imposes no 'fundamental alteration in the nature of a program' or 'undue financial and administrative burdens.'"  *Groner*, 250 F.3d at 1044 (quoting *Smith & Lee Assocs.*, 102 F.3d at 795); *see also*

---

[5]Section 3604(f)(3)(A) uses the phrase "full enjoyment of the premises," while § 3604(f)(3)(B) requires an "equal opportunity to use and enjoy a dwelling."  There is no substantive distinction between the two phrases; both express an aspiration to put disabled persons on equal footing with non-disabled persons.

*Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578 (2d Cir. 2003) ("A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations sought do not pose an undue hardship or a substantial burden.").

### 3. Whether To Shift the Burden of Persuasion

Finally, we turn to the mechanics of this standard. To appraise the magnitude of the burden that the requested modification would impose on the defendant, the Hollises urge this court to employ a burden-shifting framework. Their proposed framework would locate the initial burden of persuasion on the plaintiff to establish that the requested accommodation or modification is both reasonable and necessary. The burden would then shift to the defendant to demonstrate that the accommodation or modification would create an undue hardship. The Hollises model their proposed framework in part on a single sentence in *Groner*, where this court stated that, after the plaintiff establishes the reasonableness of the proposed accommodation, the burden of persuasion shifts to the defendant to show that the accommodation would impose an undue hardship. 250 F.3d at 1044.

There are two ways to understand the statement in *Groner*. One interpretation is that *Groner* altered this circuit's discrimination law by shifting the ultimate burden of persuasion to the defendant to show undue hardship once the plaintiff makes a *prima facie* showing of necessity and reasonableness. The Hollises suggest this reading would be consistent with *Lapid-Laurel, LLC v. Zoning Board of Adjustment*, 284 F.3d 442, 457–58 (3d Cir. 2002), which held that the burden to prove *un*reasonableness shifts to the defendant once the plaintiff shows that the requested accommodation is necessary. In *Lapid-Laurel*, however, the Third Circuit was bound by circuit precedent holding that the initial burden of proving unreasonableness falls on the defendant, *see id.*, an allocation that was in direct conflict with *Groner*, which imposed the burden to demonstrate reasonableness on the plaintiff. *See Groner*, 250 F.3d at 1045. *Lapid-Laurel* is therefore a bad lens through which to interpret *Groner*.

The Hollises also claim to find support for this interpretation in *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1183–84 (6th Cir. 1996). But that case too is a poor source of guidance. *Monette* involved a claim brought under the Americans with Disabilities Act, which defines unlawful employment discrimination to include the failure to make "reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).  The statute thus includes "undue hardship" as an element of liability and expressly places the burden of proving that element on the employer.  *Cf. Schaffer* ex rel. *Schaffer v. Weast*, 546 U.S. 49, 57 (2005) ("[T]he burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants[] when such elements can fairly be characterized as affirmative defenses or exemptions.").[6]  In stark contrast, undue hardship is not an element of an FHA reasonable-accommodation or reasonable-modification claim; it is merely one consideration in the broader reasonableness calculus.  Because *Groner* puts the burden to prove reasonableness on the plaintiff, *Monette* provides scant help in determining the proper allocation of the burden in FHA cases.

The better interpretation of *Groner* is that the court was simply explaining how a defendant can obtain summary judgment in an FHA reasonable-accommodation case.  A close look at the basic summary-judgment standard shows why.  When a plaintiff brings an FHA reasonable-accommodation or reasonable-modification claim, the burden of persuasion—*i.e.*, the ultimate burden to prove both reasonableness and necessity—lies always with the plaintiff.  *See Groner*, 250 F.3d at 1044–45; *Smith & Lee Assocs.*, 102 F.3d at 796 n.11.  If the case goes to trial, in other words, it is the plaintiff rather than the defendant who must show that the request is both reasonable and necessary.  But when the defendant moves for summary judgment, the *defendant* bears the burden to show that there is no genuine issue of material fact and that the defendant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Lindsay*, 578 F.3d at 414.  The defendant can do this in one of two ways—either by arguing that the plaintiff has failed to come forward with evidence establishing as essential element of the plaintiff's claim, *see* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2727 (3d ed. 2014), or by arguing that, in light of all of the evidence adduced by both parties,

---

[6]Undue hardship cannot fairly be characterized as an affirmative defense or exemption to a reasonable-accommodation or reasonable-modification claim.  Affirmative defenses and exemptions generally come from the statutory text, *see Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91–92 (2008), and the FHA nowhere states that undue hardship is an affirmative defense to reasonableness.  Undue hardship is simply the other side of the reasonableness coin.

no reasonable jury could return a verdict for the plaintiff, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

*Groner* is best understood to be an explanation, albeit a cursory one, of what a defendant must establish to win summary judgment in FHA reasonable-accommodation cases. The court did not expressly link its burden-shifting framework to the burden shifting that is inherent in the general summary-judgment standard. But *Groner* involved an FHA plaintiff's appeal of an order awarding summary judgment to the defendant, and the court's subsequent analysis of the reasonableness of the plaintiff's requested accommodations makes clear that the ultimate burden of persuasion never shifted to the defendant. *See, e.g.*, *Groner*, 250 F.3d at 1045 ("Groner was unable to demonstrate that either of these proposed accommodations was reasonable.").

We therefore do not interpret *Groner* to shift the ultimate burden of persuasion in an FHA reasonable-accommodation or reasonable-modification claim. Indeed, the Supreme Court repeatedly has cautioned the courts not to shift the burden of persuasion absent a clear statement of congressional intent to deviate from the "ordinary default rule that plaintiffs bear the risk of failing to prove their claims." *See Weast*, 546 U.S. at 56–58 ("Absent some reason to believe that Congress intended otherwise, . . . the burden of persuasion lies where it usually falls, upon the party seeking relief."). The ultimate burden to prove both the reasonableness and the necessity of the requested accommodation or modification rests always with the plaintiff. Only when the defendant moves for summary judgment does the burden shift to the defendant to establish that there is no genuine issue for trial.

\* \* \*

In sum, the district court erred when it applied the *McDonnell Douglas* test, which focuses on intent. Intent is irrelevant in reasonable-modification cases. We therefore remand this case to the district court to apply the proper summary-judgment framework and to determine whether the CBHA met its burden to establish that there was no genuine issue of material fact and that it was entitled to summary judgment as a matter of law.

**B.**

The district court also perfunctorily dismissed the personal-capacity FHA claims asserted by Mr. and Mrs. Hollis because they "fail[ed] to distinguish their individual claims from their children's claims in both the Complaint and their briefs" and "fail[ed] to demonstrate any individual standing that [they] may have in this matter as parents of H.H. and C.A.H." *Hollis*, 974 F. Supp. 2d at 1097. The district court therefore permitted Mr. and Mrs. Hollis to proceed only as "next friends" of their disabled children. The Hollises take issue with the district court's *sua sponte* dismissal of their personal-capacity claims.

The FHA permits "[a]n aggrieved person" to file a civil action to seek redress, 42 U.S.C. § 3613(a)(1)(A), and defines "aggrieved person" to include any person who "claims to have been injured by a discriminatory housing practice," § 3602(i)(1). Recovery under the FHA is not limited to "persons who are directly and immediately subjected to discrimination." *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 231 (6th Cir. 2003). Congress intended standing under the FHA to extend to the "full limits" of Article III of the United States Constitution, and accordingly an FHA plaintiff need only allege a "distinct and palpable injury" caused by the defendant's actions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982) (internal quotation marks omitted); *see also Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013).

The Hollises alleged sufficient personal injuries to establish standing to sue individually. As the district court acknowledged, the Hollises' complaint seeks $300,000 in compensatory damages allegedly incurred when they moved from their home in Chestnut Bend—a decision they reached because they "felt as if [they] were forced out of the home," in Mr. Hollis's words. That sum includes the difference between the purchase price and sale price of their Chestnut Bend home, as well as the value of numerous improvements they made to the home while they lived there. Those costs, which the Hollises attribute to the CBHA's alleged discrimination against their children, are "distinct and palpable injuries" that affected the Hollises personally, rather than as "next friends" of their children. *Cf. Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110 (1979) (holding that a reduction in property values was an injury sufficient to provide standing to sue under the FHA). Because those pecuniary injuries were allegedly caused

by the CBHA and would be redressed by an award of damages, the Hollises have established Article III standing to bring suit, which is all the FHA requires.

**III.**

The district court's decision is vacated. The case is remanded with instructions to apply the proper summary-judgment framework to the Hollises' personal-capacity and next-friends claims under the reasonable-modification provision of the Fair Housing Act.