**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0629n.06

Case No. 20-1219

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Nov 05, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| BOBBIE JO KOOMAN, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| BOULDER BLUFF CONDOMINIUMS, et al., | ) | MICHIGAN |
| | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: ROGERS, SUTTON, and STRANCH, Circuit Judges.

SUTTON, Circuit Judge. The rules governing life in condominium communities sometimes create good-faith disputes between the associations that enforce the rules and the condo owners who follow them. But federal law does not answer every such dispute. Bobbie Jo Kooman disagreed with how the Boulder Bluff Condominium Association handled her request to install a safety railing adjacent to an eight-inch-high outdoor porch. But we agree with the district court that the Association did not violate the Fair Housing Act or its amendments in doing so.

I.

Located in Georgetown, Michigan, the Boulder Bluffs condominium complex comprises 17 buildings and 145 apartments. Under the bylaws of the community, management of the complex falls to the Boulder Bluff Condominium Association and its board of directors. The Association employs Gerow Management Company to perform these duties.

Under the bylaws, a condo owner may not make structural modifications to her apartment without approval from the Association. The bylaws instruct the Association not to approve any structural modifications that would "jeopardize or impair the soundness, safety[,] or appearance of the Condominium Project." R. 53-1 at 17.

Terry Romig bought her condo in 2009, approximately three years after she and her husband Bob Romig, divorced. Bob had heart problems, and he moved into Terry's condo when they worsened in 2012. Bob fell several times off the eight-inch-high porch in the front of the condo and the short step that leads up to it. Terry and her daughter, Bobbie Jo Kooman, decided to add a railing next to the step.

They needed permission from the Association to do so. In 2016, Kooman called Natasha Biegalle, a Gerow employee who serves as the liaison between condo owners and the Association. Kooman conveyed the railing request to Biegalle and explained that she needed the railing for her father, who had fallen several times. In later describing the call, Kooman said she told Natasha of her father's disability and Natasha was aware of his disability. Biegalle informed Kooman that she needed to make the railing request online.

A few days later, on June 17, Kooman made the same request to Biegalle by email. Referring to a photograph in the email, Kooman said that "[t]his is the railing I have picked [o]ut and this is what it will look like." R. 43-1 at 49–51. The email did not mention Bob or say why Kooman wanted the railing. On the day she received the email, Biegalle forwarded it to the Association's board of directors.

Over the next couple weeks, the five voting members of the Board considered the request. Kooman told the Board that the installation company could put up the railing around the Fourth of July. By June 27, it became clear that Kooman's request would not pass, with four members

opposing the request at that point and one favoring it. One board member worried that the railing would not match the nearby condos. The maintenance manager, the yes vote, emailed Biegalle and the board president, saying, "I don't understand the 'no' votes. . . . [A] number of other units have installed porch step rails. Granted these took place some time ago but a lot of our current residents are aging [and] need them now." R. 53-21 at 1. Biegalle agreed and emailed the Board the next day: "My fear is if we deny this request and she or her husband should fall th[e]n she for sure has grounds to sue the association because she did attempt to make the porch more 'handicap' accessible." R. 53-25 at 1.

That same day, Kooman emailed Biegalle, saying Bob fell off the porch the week before and went to the hospital as a result. She demanded "answers from the association as soon as possible" and conveyed her view that the Board should have approved the request already "to prevent injuries." R. 43-1 at 59.

On July 1, Biegalle sent a letter to Kooman on behalf of the Board, explaining that "[t]he Board has denied your request as the proposed railing would be a permanent change modifying the overall appearance of the unit in comparison to the rest of the association as well as the installation would cause damage to the concrete porch." R. 43-1 at 62. The letter invited Kooman to contact Gerow Management with any questions.

After Biegalle sent the letter, she spoke to Kooman on the phone, asking for a note from Bob's doctor to explain why he needed the railings. Biegalle indicated that the Board might approve the railings once it had the note. On July 5, Bob got a note from his doctor that read, "Robert J Romig is disabled. He needs to have side rails and hand rails for his safety." R. 43-1 at 47.

But no one took it to the Board. Bob's family took it to an attorney instead. The Board did not receive the doctor's note until August 3, when it received a demand letter from the attorney, insisting it reverse the initial decision.

On August 20, Bob fell again and broke his hand. The Board approved the railing on August 23 and asked the Romigs to remove it once Bob no longer lived there.

Bob died several months later due to heart problems. On behalf of his estate, Kooman sued Gerow and the Association, alleging that their handling of the railing request violated the federal Fair Housing Amendments Act and several state laws.

The district court granted summary judgment for the defendants on the Fair Housing Act claim and declined to exercise supplemental jurisdiction over the state-law claims.

II.

The Fair Housing Amendments Act of 1988 makes it unlawful to "discriminate against any person . . . in the provision of services or facilities in connection with [a] dwelling[] because of a [disability] of . . . a person residing in . . . that dwelling." 42 U.S.C. § 3604(f)(2). Kooman claims that Gerow and the Association "discriminate[d] against" Bob in three ways: by refusing to permit a reasonable modification, *id.* § 3604(f)(3)(A); by disparately treating their requests, *id.* § 3604(f)(2); and by interfering with his rights under the Act, *id.* § 3617.

*Refusal to permit modification.* The statute covers discrimination arising from "a refusal to permit, at the expense of the [disabled] person, reasonable modifications of existing premises occupied . . . by such person if such modifications may be necessary to afford such person full enjoyment of the premises[.]" *Id.* § 3604(f)(3)(A). To prevail, Kooman must show that (1) Bob had a disability, (2) she requested a modification on Bob's behalf, (3) the defendants refused to permit it, (4) they knew or should have known of his disability at the time, and (5) the requested

modification was reasonable and necessary. *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014).

The parties agree that Kooman satisfies the first two elements.

The third element requires some elaboration. As the district court aptly put it, "reality matters more than labels." R. 77 at 18. A housing provider's delay in answering a request may count as a refusal, even if it never explicitly denies the request. *See Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 622 (6th Cir. 2011); *Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199–200 (5th Cir. 2000). And a housing provider's request for more information may not necessarily count as a refusal, even if in the interim it does not allow a modification to go forward until the information is provided (so long as the provider does not request "unreasonably excessive information"). *See Spencer*, 415 F. App'x at 622. "But a duty to respond to a request is not necessarily the same as a duty to grant or deny it immediately," *Moody v. Gongloff*, 687 F. App'x 496, 499 (6th Cir. 2017), because a housing provider may "seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation," *Spencer*, 415 F. App'x at 621. Still, any delay in responding to a request must be reasonable. *See Moody*, 687 F. App'x at 499.

The first question under these principles is whether the July 1 letter counted as a statutory rejection. We think not. Kooman presented the request with an expedited schedule for completing the railing and continued exchanging information with the Association after it initially denied the request. The letter suggested as much by inviting Kooman to reach out to Biegalle with questions. More importantly, in later conversations between Kooman and Biegalle, Biegalle recommended Kooman submit a doctor's note about the alleged disability, plainly a legitimate request and plainly

a sign that the matter was not over. On top of that, Biegalle suggested to Kooman that the Board could approve her request once it had the doctor's note.

Recall the timeline. Terry asked for permission to install a railing a few days before June 17. Then on June 23, she told the Board that she wanted to put it up around the Fourth of July. Then on June 28, she pressed the Board to reach a decision as soon as possible and mentioned Bob's fall the week before. Because the June 28 email was the first time Kooman mentioned Bob in writing, the Board was entitled to request more information and deny her request in the meantime to make sure the construction did not moot the approval process, a point that Kooman conceded at oral argument.

A second possibility is that the Board constructively refused her request through unreasonable delay. Recall that the initial request came on June 17 and the Board approved it on August 23, 68 days later. But we have upheld similar delays before, drawing on the specific facts of the case. *Spencer* found no unreasonable delay where the housing provider waited for two and a half months after receiving the initial request, which contained a letter from a doctor from the outset, though it noted that had certain aspects of the case been different, the delay's reasonableness would have been a jury issue. 415 F. App'x at 622. *Moody* determined that the housing authority acted reasonably when it approved a request 87 days after receiving a letter from the plaintiff's doctor because the plaintiff "caused much of the delay." 687 F. App'x at 499. In this instance, it took just 20 days after the Board received the doctor's note to approve the request, and it took more time only because Kooman and Terry waited almost a month before delivering the note to the Board.

But even if we treated the July 1 letter as a final rejection, Kooman still can't satisfy the other two elements. As of July 1, the Board neither knew nor should have known that Bob was

disabled, which means that he had a "physical . . . impairment [that] substantially limit[ed] one . . . of [his] major life activities." 42 U.S.C. § 3602(h); *see Hollis*, 760 F.3d at 541. The voting board members all testified that they did not know that Bob had a disability when they voted. Many of them said that they did not realize that the railing was being requested on his behalf. Nor should the Association have known about Bob's disability. When the Board denied the initial request, it just had Kooman's first phone call, her later email, and the maintenance manager's email: Bob was "feeble," in "bad health," "not very well balanced on his legs," and he had fallen. R. 53-16 at 3; R. 53-6 at 5. That describes a lot of older people but not necessarily disabled people. It does not show that the Board knew about a "physical . . . impairment [that] substantially limit[ed] one . . . of [his] major life activities." 42 U.S.C. § 3602(h).

The Board likewise could not have known, from the information it had on July 1, that the railing was "necessary" for Bob's "full enjoyment of the premises." 42 U.S.C. § 3604(f)(3)(A). To be necessary, the railing had to be more than "merely helpful or conducive." *Cinnamon Hills Youth Crisis Ctr. v. St. George City*, 685 F.3d 917, 923 (10th Cir. 2012) (Gorsuch, J.). It had to be "essential" to giving Bob the "same opportunity to use and enjoy [his] condo as compared" to someone without a disability. *Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 490 (6th Cir. 2019) (quotation omitted); *see Hollis*, 760 F.3d at 541 n.5. Until it received the doctor's note, the Board could not have known that this railing, attached to an eight-inch-high porch, was "something that '[could not] be done without.'" *Cinnamon Hills Youth Crisis Ctr.*, 685 F.3d at 923 (quotation omitted). After all, Bob had lived in the condo for many years without it. *See Davis*, 945 F.3d at 490.

Other courts have reached similar outcomes in similar circumstances. Once a request is made, as the Fourth Circuit has explained, the decisionmaker must have the opportunity to make

a "final decision" on the request. *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602 (4th Cir. 1997). Another court has applied the final-decision requirement to its merits discussion of the refusal element, adding that a decision cannot be considered final until the decisionmaker has had a chance to "conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1219 (11th Cir. 2008) (quotation omitted). Whether it goes to the "refusal" element or to the "necessary" element, a housing provider must know that an accommodation is necessary in order to become liable for refusing it. *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1275 (10th Cir. 2001); *Schwarz*, 544 F.3d at 1219.

Kooman insists that the Board should have requested the doctor's note before it sent her the initial rejection letter. But how would that have made a difference? Either way, the Board would have asked for a doctor's note in late June or early July. And either way, it would not have had an obligation to grant the request before the scheduled installation around the Fourth of July. Keep in mind, moreover, that nothing prevented Kooman from removing this issue at the outset by submitting a doctor's note with her initial request.

She adds that *Bryant Woods* supports her argument that the July 1 letter was a refusal because the Fourth Circuit held that "a violation occurs when the disabled resident is first denied a reasonable accommodation, irrespective of the remedies granted in subsequent proceedings." 124 F.3d at 602. But it qualified the point by explaining that, before there can be a "deni[al]," the decision must be "final." *Id.*; *see Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013); *Groome Res.*, 234 F.3d at 199. The Board's July 1 rejection letter was not final. Other aspects of *Bryant Woods* undermine reliance on it anyway. The plaintiffs not only lost a zoning variance request before the planning board, but they also lost their motion for

reconsideration. *Bryant Woods*, 124 F.3d at 600–01. The court determined that the planning board's decision was final, even though the plaintiffs could have appealed it to the county's appeals board. *Id.* at 601–02. In this instance, the same entity granted relief after getting the requisite information. *See Scoggins*, 718 F.3d at 270–71.

Kooman says the Board had enough information before July 1 to know that Bob had a disability. But although Kooman contends Biegalle became aware of the disability during the first call, it is not apparent whether Kooman conveyed anything beyond the fact that her father was not well-balanced and needed rails for stability. At oral argument, Kooman admitted that the record does not clearly reflect whether she invoked the term "disability" during the call. That Bob was in poor health does not mean he had a disability under the Act. Nor does Biegalle's June 28 email, raising the possibility that the Board could be liable because Kooman had tried to make the porch more accessible for disabled persons, change things. Biegalle, who is not an attorney, was referring to the maintenance manager's description of Bob's poor health, not giving a legal opinion about disability under the Fair Housing Act. The Board understood as much. Plus, even if the phone call or the email showed knowledge of his disability, it still would not show that the Board knew that the railing was necessary for Bob to fully enjoy his condo. *Davis*, 945 F.3d at 490. All that it tended to show was that the railing would be "helpful" or "conducive." *Cinnamon Hills Youth Crisis Ctr.*, 685 F.3d at 923. That does not suffice.

*Disparate Treatment*. Section 3604(f) authorizes lawsuits based on "disparate treatment." *Hollis*, 760 F.3d at 538. A disparate-treatment claim requires a showing of "intentional discrimination." *Id.* at 537. But that did not happen.

The Board, as shown, did not know that Bob had a disability under the Act at the time it refused to grant initial permission for a fast-track modification. The Board's deliberations show

that its decision turned on legitimate, non-discriminatory reasons: structural integrity, appearance, and uncertainty about the need for a railing next to an eight-inch-high porch. The Board's bylaws forbid it from approving modifications that would "jeopardize or impair the soundness, safety[,] or appearance of the Condominium Project." R. 53-1 at 17.

Kooman suggests that the Board's justifications amount to pretext, noting that the family planned to pay for the railing, thereby making any discussion of cost a smokescreen. But once the Board learned that it would not have to pay for the railing, cost ceased to be a talking point. And the July 1 letter did not mention cost; the letter discussed only uniform appearance and structural damage. As for appearance, Kooman says that this was pretext because many board members did not look at the area before approving the railing. But one member who lived nearby did check, and the Board could accept his report that the railings looked out of character. In a similar vein, she points out that most of the board members did not check on the railing after they were installed either. But by then, they had no reason to do so.

Shifting gears, she points to a comment made during a discussion at the July meeting, where an unidentified Board member stated, "this is not our responsibility." R. 53-7 at 7. This "callous . . . remark," she suggests, shows that the Board did not really care about appearances. Reply Br. 14. But after the fact finger-pointing tells us nothing about the original reasons for the decision. She adds that the Board had approved similar railings before. But she failed to present evidence showing where they were and whether they matched the surrounding area. Such naked allegations do not suffice to rebut a summary judgment motion.

Invoking *Choices in Community Living, Inc. v. Petkus*, 517 F. App'x 501 (6th Cir. 2013), Kooman argues that this case isn't a typical disparate-treatment claim. Rather, it is a "blend" of disparate treatment and disparate impact because Boulder Bluff and Gerow "willfully ignored the

facts and instead decided it was better to just move forward and deny the request for no other reason [than] that they did not want to allow the modification." Appellants' Br. 37. This framing does not change anything. *Choices in Community Living* followed *Lindsay v. Yates*, 578 F.3d 407 (6th Cir. 2009), in applying the *McDonnell Douglas* test to claims like Kooman's that "do[] not neatly fall into" the disparate treatment, disparate impact, and failure to make reasonable accommodations categories. 517 F. App'x at 505. We clarified in *Hollis* that *Lindsay*'s test is the right one for run-of-the-mill disparate-treatment claims. *Hollis*, 760 F.3d at 538–39.

*Interference with Fair Housing Act rights*. Section 3617 of the Fair Housing Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, . . . or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section . . . 3604 . . . of this title." 42 U.S.C. § 3617. Kooman claims that Gerow is liable under § 3617 because Biegalle, Gerow's employee, "interfered with" Bob in the enjoyment of his rights by participating in the Board's deliberations without requesting a doctor's note and by drafting the July 1 rejection letter without seeking a legal opinion. To prevail, she must show that Biegalle was "in a position directly to disrupt the exercise or enjoyment of a protected right and exercise[d] [her] powers with a discriminatory animus." *Michigan Prot. & Advoc. Serv., Inc. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994).

Kooman first mentioned § 3617 in her opening brief on appeal, which is no place to bring a new cause of action. *See United States v. Hamm*, 952 F.3d 728, 743 (6th Cir. 2020). Even if we considered the claim on the merits, it would fail. When Biegalle "exercise[d] [her] powers," it was to advance, rather than disrupt, the request for a modification. Nothing suggests that Biegalle acted out of discriminatory animus. Biegalle looks more like someone the statute protects than penalizes. She "aided" Bob's exercise and enjoyment of his Fair Housing Act rights by

11

recommending that the Board approve his railing, and she "encouraged" Kooman over the phone by suggesting that the Board would approve the railing with a doctor's note.

Kooman insists that courts have applied the "interfere with" language broadly "to reach all practices which have the effect of interfering with" Fair Housing Act rights. *Babin*, 18 F.3d at 347. Even so, "[i]n this Circuit, a plaintiff is required to demonstrate 'discriminatory animus' to prevail on an interference claim under the [Fair Housing] Act." *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012) (quotation omitted). Because Kooman has not made this showing sufficiently, we cannot say that § 3617 applies.

We affirm.