NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0368n.06

Case No. 23-5897

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Aug 26, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| JOSHUA A. DEBITY, et al., | ) | |
|    Plaintiffs-Appellants, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| VINTAGE VILLAGE HOMEOWNERS | ) | |
| ASSOCIATION, | ) | |
|    Defendant-Appellee. | ) | O P I N I O N |
| | ) | |

Before: MOORE, NALBANDIAN, and BLOOMEKATZ, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Joshua and Leah Debity wanted a backyard fence to give their young, disabled son, G.D., security and privacy. They requested approval from the Vintage Village Homeowners Association (HOA) to install a six-foot wooden privacy fence. The HOA instead approved a six-foot, wrought-iron fence. So the Debitys sued, alleging the HOA violated the Fair Housing Act (FHA). The district court excluded certain testimony from G.D.'s medical provider and granted summary judgment for the HOA. The Debitys appeal, arguing that the district court improperly limited the medical provider's proposed testimony and ignored material evidence in granting summary judgment. We agree and REVERSE and REMAND.

## I.

G.D. has nonverbal autism and a sensory processing disorder. He was five years old when the events in this lawsuit began. Because of his medical conditions, which make him prone to

eloping (that is, running away from caregivers) and removing his clothing, he needs constant care and supervision. He's extremely curious and doesn't understand the concept of danger. And his disrobing has become more of an issue as he has grown older, making it "a huge struggle to keep clothes on him." R. 41-1, L. Debity Dep., p. 34, PageID 470. Also, he was in the 99th percentile in his growth charts.

The Debitys began house hunting in Maryville City, Tennessee in summer 2021 solely to enroll G.D. in Foothills Elementary's popular special-education program. They made a successful offer on a home (Property) in the Vintage Village residential subdivision. They wanted to install a backyard fence as soon as possible given G.D.'s propensity to elope and the unenclosed drainage pond behind the Property.

The HOA, managed by a Board of Directors, oversees Vintage Village. During the relevant time, the Board had four members: President Nicholas Black, Vice President Christine Brooks, Secretary Misty Castiglia, and Counsel David Richman. The sixteen properties in the subdivision are subject to the "Declaration of Covenants, Conditions and Restrictions for Vintage Village Subdivision" (Covenants). R. 34-1, Black Decl., p. 2, ¶¶ 5–6, PageID 157. One covenant precludes installing a fence without the HOA's written approval:

> All fences of any kind must be approved in writing by the Homeowners Association of Vintage Village prior to any installation or construction of the same. Hedges not greater than 4 feet in height shall be permitted, provided they create no obstruction or safety hazard. Decorative fence sections shall be permitted, upon written approval of the Homeowners Association of Vintage Village, but must be erected behind the sidewalk. No chain link fences shall be allowed. Underground fencing for pet containment shall be encouraged. Decorative perimeter fencing installed by the Developer may not be removed or altered.

*Id.* at 19–20, PageID 174–75.

Because the Debitys wanted a fence fast, they got a copy of the Covenants before their closing date. After taking a look, Joshua Debity called Nicholas Black to discuss the fence request. He told Black that G.D. had special needs, and they discussed those needs as part of the request. He explained that he wanted to install a wooden fence as a "privacy accommodation for child nudity" and because wood was cheap. *Id.* at 4, ¶ 14, PageID 159.

After Joshua and Black spoke, the HOA's counsel, David Richman, called Joshua. Richman acknowledged G.D.'s disabilities, and Joshua explained that he wanted to install a wooden fence to prevent G.D. from eloping and because wood was cheap. Richman mentioned that there was already one wooden privacy fence in the subdivision. Yet Richman said that the HOA required fences to be wrought iron like others in the subdivision. He offered to offset the cost of an iron fence by waiving the first year of HOA dues.

Joshua emailed the HOA with additional information. He again explained that he wanted to install a fence in the Property's backyard and requested clarification on what kind of fencing material the HOA would approve. He reiterated Richman's guidance that the HOA required wrought iron, which wouldn't give G.D. privacy. He repeated his desire to install a cheaper wooden privacy fence that would provide privacy and prevent G.D. from running out into the street or drowning in the drainage pond. Joshua also noted that the HOA's justification for the iron requirement didn't make sense since there was already a wooden privacy fence in the neighborhood. He ended by requesting all documentation about the existing wooden fence's approval. The HOA's vice president, Christine Brooks, responded that the Debitys were potential homeowners, so they had to wait to submit their fence request until they owned the Property.

The Debitys bought the Property on July 23. After that, the HOA's secretary, Misty Castiglia, emailed one of Vintage Village's developers to ask why the existing wooden fence in

the neighborhood had been approved. The developer responded that they built that fence to protect from noise pollution and flying debris from a nearby road.

The Debitys then submitted a written request to install a six-foot wooden privacy fence. On August 4, the HOA approved a six-foot fence but denied a wooden privacy fence, insisting on a wrought-iron picket fence instead. The HOA's partial approval included a message: "Please help us understand your privacy concerns. Based on the public listing of your prior residence, it appears that privacy fencing was nonexistent." R. 40-1, J. Debity Dep., p. 131, PageID 409.

In January 2022, the Debitys sued, alleging discrimination under the FHA and requesting declaratory relief, injunctive relief, damages, and attorney's fees. That August, they bought a different home—also zoned for Foothills Elementary—and moved because they believed G.D. was unsafe on the Property. G.D. couldn't go outside and developed extreme anxiety and OCD. The Debitys sold the Property in November 2022 without installing a fence.

During discovery, the Debitys disclosed Kristin Gregory, PA-C, MMS, as one of G.D.'s medical providers and noticed her as an expert witness. They explained that Gregory may testify about "G.D.'s medical diagnoses, treatment, conditions and need for certain accommodations in his living environment." R. 30-1, Mot. to Strike, p. 1, PageID 111. They also provided a document that the parties describe as a "report." That document, however, was illegible. The HOA moved to strike Gregory's report and exclude her testimony about any information or opinions on the need for the Debitys' requested fence. The Debitys countered that, as G.D.'s treating medical provider since birth, Gregory can testify about what "G.D. requires to keep him safe and regulated." R. 35, Resp. Mot. to Strike, p. 12, PageID 214.

The HOA also moved for summary judgment. The Debitys responded that summary judgment was improper because genuine issues of material fact exist as to whether a six-foot wooden privacy fence was necessary under the FHA.

The district court held that Gregory could opine on G.D.'s "treatment and what she learned through G.D.'s treatment" but could not opine on "whether G.D. required a six-foot wooden privacy fence." R. 56, Order Mot. to Strike, pp. 4–5, PageID 530–31. In a separate order, the court granted summary judgment, concluding that the Debitys failed to show that a six-foot wooden privacy fence was necessary under the FHA.

## II.

This appeal presents two issues.[1] First, did the district court abuse its discretion by limiting Gregory's testimony? Second, did the district court err by granting summary judgment?

## A.

We start with the district court's ruling on Gregory's testimony, which we review for abuse of discretion. *United States v. Hazelwood*, 979 F.3d 398, 408 (6th Cir. 2020). "An abuse of discretion occurs when the district court relies on clearly erroneous facts, uses an erroneous legal standard, or improperly applies the law." *Id.* The crux of this issue is whether Gregory's offered testimony about G.D.'s needs is lay or expert opinion testimony.

As percipient witnesses who also possess specialized knowledge, treating physicians can blur the line between the two. Federal Rule of Evidence 701 governs lay opinion testimony and Federal Rule of Evidence 702 governs expert opinions. The main difference is that a lay opinion

---

[1] The Debitys abandon their requests for injunctive and declaratory relief because they do not challenge on appeal the district court's determination that they lack standing to seek such relief. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) (order) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal.").

cannot be "based on scientific, technical, or other specialized knowledge," which is the province of Rule 702 expert testimony. Fed. R. Evid. 701.

And expert opinion testimony comes with disclosure requirements. *See* Fed. R. Civ. P. 26(a)(2)(A). Under Federal Rule of Civil Procedure 26(a)(2)(B), disclosure of an expert witness who is "retained or specially employed to provide expert testimony" requires submitting a written report setting forth the opinions offered and the bases for those opinions. Under Rule 26(a)(2)(C), added in 2010, a witness who is offering expert testimony, and who is not a retained expert, must make a summary disclosure only. That disclosure requires a statement of "the subject matter" of the expected expert testimony and "a summary of the" opinions to be offered and the facts supporting those opinions.[2]

Courts sometimes face challenges distinguishing between when a treating physician is offering lay versus expert testimony. *See United States v. Betro*, __ F.4th __, 2024 WL 3811838, *9 (6th Cir. Aug. 14, 2024). But putting aside the potentially complicated situations when a treating physician might be giving expert testimony, our cases have generally held that a physician can offer, as a lay witness, testimony about his "first-hand observations and treatment," *United States v. Wells*, 211 F.3d 988, 998 (6th Cir. 2000), and opinions based on what the physician learns through actual treatment of the patient and "ordinary medical training," *Fielden v. CSX Transp.,*

---

[2] In adding this subsection, the Advisory Committee hoped to resolve "a tension" that often resulted in courts requiring reports under Rule 26(a)(2)(B) from witnesses exempted from the report requirement, that is, from witnesses not specially retained or employed to provide expert testimony. Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment. The Advisory Committee identified "physicians or other health care professionals" as "[f]requent examples" of witnesses who may testify as both fact and expert witnesses. *Id.* If not specially retained to provide testimony, these witnesses don't have to provide a report under Rule 26(a)(2)(B) but must still provide the summary disclosures under Rule 26(a)(2)(C). *Id.* The Advisory Committee also made clear that "[t]he (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present." *Id.*

*Inc.*, 482 F.3d 866, 872 (6th Cir. 2007); *accord Betro*, 2024 WL 3811838, at *9. So the lay testimony that a treating physician gives must be linked to the core of the treatment.

Applying these principles to the district court's specific holdings, we agree that Gregory can testify "to G.D.'s propensity to behave a certain way or do certain things as a result of his special needs, which may inherently indicate the need for a fence." R. 56, Order Mot. to Strike, p. 5, PageID 531. And we agree that she cannot offer opinion testimony that strays from "a permissive core on issues pertaining to [her] treatment" of G.D. *Id.* at 4, PageID 530 (quoting *Fielden*, 482 F.3d at 871).

But we disagree that Gregory's opinion about "whether a particular type of fence is necessary to accommodate G.D.'s special needs" would stray from this core. *Id.* at 5, PageID 531. Her testimony that G.D. requires certain privacy measures, like a privacy fence in his backyard to prevent him from exposing himself, falls within her years-long "first-hand observations and treatment" of his autism and sensory-processing disorder. *Wells*, 211 F.3d at 998. Just as she might prescribe G.D. a particular medicine to manage the symptoms of his autism, her fencing recommendation is part of her treatment plan for his sensory-processing disorder. Gregory's proposed testimony properly related to her own first-hand observations and treatment—it was not related to complicated causation judgments. *See, e.g.*, *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426–28 (6th Cir. 2009) (affirming exclusion of treating physicians' causation opinions in a toxic tort case). So it is lay testimony and the district court abused its discretion when it held that the Debitys failed to show that Gregory possessed any personal knowledge or experience

7

sufficient to form an opinion about G.D.'s need for a privacy fence. We reverse the district court's ruling as to her testimony.[3]

**B.**

Turning to the Debitys' argument that the district court erred in granting summary judgment, we review de novo. *McKenna v. Dillon Transp., LLC*, 97 F.4th 471, 474 (6th Cir. 2024). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all evidence in the light most favorable to, and draw reasonable inferences in favor of, the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[O]nce a party moves for summary judgment and identifies record materials showing no genuine dispute of material fact, the nonmoving party 'must make an affirmative showing with proper evidence in order to defeat the motion.'" *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 445 (6th Cir. 2021) (quoting *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009)).

The FHA prohibits discrimination "against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." 42 U.S.C. § 3604(f)(2). This includes "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied . . . by such person if such modifications may be necessary to afford such person full enjoyment of the premises" and "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal

---

[3] Because Gregory offered only lay opinion testimony governed by Rule 701, no disclosure was required.

opportunity to use and enjoy a dwelling."[4]  *Id.* § 3604(f)(3)(A), (B).  The Debitys argue their FHA claim under these reasonable-modification and reasonable-accommodation theories.[5]  Our circuit applies the same elements to both theories.  *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014).

To prevail, the Debitys must establish that (1) G.D. had a disability, (2) they requested a modification on G.D.'s behalf, (3) the HOA refused to permit the requested modification, (4) the HOA knew or should have known of G.D.'s disability at the time of refusal, and (5) the requested modification was reasonable and necessary to afford G.D. an equal opportunity for enjoyment. *See id.* at 540–41.  And here, "'[e]qual opportunity' means that disabled individuals are entitled to live in the same residences and communities as non-disabled individuals, insofar as that can be accomplished through a reasonable accommodation or modification."  *Id.* at 541.  So we "examine[] whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive."  *Id.*

The district court analyzed the fifth element's necessity prong only, holding that the Debitys failed to establish this piece of their FHA claim.  The Debitys argue they presented enough evidence about the need for a wooden privacy fence to prevent summary judgment.  This evidence included: (1) G.D.'s sensory-processing disorder makes him prone to removing his clothing, and this behavior has only become *more* of an issue as he gets older; (2) G.D. was in the 99th percentile

---

[4] There is no substantive distinction between "full enjoyment of the premises," and "equal opportunity to use and enjoy a dwelling."  *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 n.5 (6th Cir. 2014) (quoting 42 U.S.C. § 3604(f)(3)(A), (B)).  Both phrases "express an aspiration to put disabled persons on equal footing with non-disabled persons."  *Id.*

[5] They also alleged that the HOA enforced the Covenants in a manner that had a disparate impact on them.  But they abandoned any disparate-impact theory at the summary-judgment stage.

on the growth charts; (3) Joshua conveyed his privacy concern to the HOA's President by requesting a wooden fence "for privacy accommodation for child nudity," R. 34-1, Black Decl., p. 4, ¶ 14, PageID 159, and (4) Joshua reiterated his concern to the HOA's vice president by noting that "a metal fence like others have in the neighborhood . . . provides no privacy," *id.* at 27, PageID 182. And the record shows that the document approving a six-foot wrought iron fence included the message: "Please help us understand your privacy concerns. Based on the public listing of your prior residence, it appears that privacy fencing was nonexistent." R. 40-1, J. Debity Dep., p. 131, PageID 409.

The district court acknowledged that the Debitys' fencing request came from two concerns: security and privacy. Yet when finding that the Debitys failed to "show how the approved wrought iron fence would not adequately alleviate their concerns," R. 60, Order MSJ, p. 7, PageID 562, the court didn't address any evidence about their privacy concern. It analyzed evidence related only to security, ignored the evidence that they requested a wooden privacy fence *because of G.D.'s propensity to disrobe*, and refused to draw reasonable inferences in a light most favorable to the Debitys. That was error. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

A reasonable jury could weigh the Debitys' evidence, including Gregory's testimony, to find that the HOA-approved see-through, wrought-iron fence wouldn't provide adequate privacy to G.D. if he disrobed but that a wooden privacy fence would allow him "to receive the '*same enjoyment from the property as a non-disabled person would.*'" *Anderson v. City of Blue Ash*, 798 F.3d 338, 361 (6th Cir. 2015) (quoting *Hollis,* 760 F.3d at 541).

All in all, the Debitys presented enough evidence to create a genuine issue of material fact that a wooden privacy fence "was necessary to afford [G.D.] the equal opportunity to enjoy the

housing of his choice." *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002). We reverse the district court's grant of summary judgment.

## III.

For these reasons, we REVERSE and REMAND for further consideration consistent with this opinion.